IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DARRYL P. CONNELLY,

      Plaintiff,

      v.

METROPOLITAN ATLANTA
RAPID TRANSIT AUTHORITY and
CHERYL KING,

      Defendants.

CIVIL ACTION FILE

NO. 1:11-CV-02108-TWT-GGB

## <u>NON-FINAL REPORT AND RECOMMENDATION</u>

In this employment discrimination action, Plaintiff Darryl Connelly is bringing claims for race discrimination and retaliation against his former employer, the Metropolitan Atlanta Rapid Transit Authority ("MARTA"), and his former supervisor, Cheryl King. This case is now before the Court on Defendants' Joint Motion for Summary Judgment (Doc. 75). After review, I conclude that Connelly has failed to produce sufficient circumstantial evidence to support his discriminatory termination claims. Connelly has, however, submitted enough evidence that a reasonable jury could return a verdict in his favor on his retaliation claims. Accordingly, I **RECOMMEND** that the Motion for Summary Judgment (Doc. 75) be **GRANTED IN PART AND DENIED IN PART**.

# I. Procedural Background

In June 2011, Connelly filed a four-count complaint against Defendants raising claims under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. (Doc. 1). Count One of the complaint asserts that MARTA terminated Connelly on account of his race, in violation of Title VII. (Id. ¶¶ 34-37). Count Two states that MARTA unlawfully retaliated against Connelly after he engaged in activity protected by Title VII. (Id. ¶¶ 38-41). Count Three alleges that both defendants violated § 1981 by terminating Connelly due to his race. (Id. ¶¶ 42-45). Finally, Count Four raises a claim of retaliation against both defendants under § 1981. (Id. ¶¶ 46-50). Defendants answered the complaint (Docs. 3, 4), and, following discovery, filed the present motion for summary judgment. (Doc. 75). The summary judgment motion has been fully briefed and is now ready for the Court's decision.

# II. Summary Judgment Standard

Summary judgment is proper when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). The movant carries its burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "Only when that burden has

2

been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." Celotex Corp., 477 U.S. at 324; 106 S.Ct. at 2553 (quotation omitted); see Fed.R.Civ.P. 56(c). "[M]ere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." Ellis v. England, 432 F.3d 1321, 1326 (11th Cir. 2005). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

## II. Facts

In light of the foregoing standard, the Court finds the following facts for purposes of this summary judgment motion only. Connelly, who is Caucasian, began working for MARTA in 2002. (Doc. 75-2, Defendant's Statement of Material Facts, ("SMF")

¶ 1).[1] He was promoted to the position of Director of Transit Oriented Development & Real Estate ("TOD") in March 2006.  (Id. ¶ 2).  Connelly's immediate supervisor was the Assistant General Manager of Planning.  (Id. ¶ 3).  In November 2008, MARTA hired Cheryl King, who is black, to fill that position.  (Id.; Doc. 83-2, Plaintiff's Statement of Material Facts ("PSMF"), ¶ 29).

In December 2008, King met with some of Connelly's subordinates.  (Doc. 54, King Dep. at 132-33). Two employees, John Remillard and Ted Tarantino, told her that Connelly was an inefficient manager and was "delaying the work of the office." (Doc. 75-3, Exh. 1, Remillard Aff. ¶ 9;  Doc. 75-4 , Exh. 2, Tarantino Aff. ¶ 10).  King recalls that the staff also raised concerns about Connelly's poor communication with the staff, but employee Jason Ward does not remember anyone addressing that issue during the meeting.  (Compare Doc. 54, King Dep. at 134-35 with Doc. 87, Ward Dep. at 46-47).

On three occasions, Connelly heard King make remarks that he believed were indicative of racial bias.  At a January 2009 planning meeting, an outside developer, Ray Argo, who was Caucasian, was giving a presentation on the time line for a certain project. (PSMF ¶¶ 32-34).  While Argo was speaking, King became "extremely upset."

---

[1]All undisputed facts are taken from the parties' Statements of Material Fact. All disputed facts are followed by citations to the record.

AO 72A
(Rev.8/82)

(Id. ¶ 35). She looked at Argo and at Connelly, and stated, "I'll bet you think I'm a mean black bitch." (Id. ¶ 36). After hearing that comment, Connelly became "very concerned that [King] might be a racist." (Doc. 52, Connelly Dep. at 104).

On another occasion, King became upset that Connelly had used three-ring binders for a new set of guidelines. (PSMF ¶ 40). She reminded Connelly that she had previously instructed her subordinates not to use three-ring binders because of cost concerns. (Doc. 54, King Dep. at 197-98). She told Connelly, "I don't care if you do consider me a mean black bitch. I want this to be complied with." (PSMF ¶ 40). The third incident where King made reference to race occurred during a meeting with a developer in May 2009. (Id. ¶¶ 42-45). King became upset with the developer's representatives, who were Caucasian, and instructed Connelly to "Tell them I'm a mean black bitch." (Id. ¶¶ 43-45). Aside from those three incidents, Connelly also observed that King would visit with black employees, but not with him or with Ted Tarantino, who also was Caucasian. (Doc. 52, Connelly Dep. at 107-08).

On June 15, 2009, King called Connelly into her office and told him that she had received complaints that he was not returning telephone calls and was behaving arrogantly. (PSMF ¶ 48; Doc. 52, Connelly Dep. at 184).[2] Connelly asked for more

---

[2]One section of Connelly's deposition suggests that the meeting took place on May 29, 2009, (see Doc. 52, Connelly Dep. at 184), but the parties agree that it

AO 72A
(Rev.8/82)

details about the complaints, but King declined to provide any further information. (Id.). Connelly accused King of "railroading" him and stated that he was going to hire an attorney and file a complaint with MARTA's Office of Diversity and Equal Opportunity ("DEO"), which is responsible for investigating claims of discrimination.[3] (Doc. 52, Connelly Dep. at 184-85; PSMF ¶ 52). King then announced that she was going to "write up" Connelly. (Doc. 52, Connelly Dep. at 185). Connelly understood that as a response to his statement that he was going to file a DEO complaint. (Id. at 186). At that point, the conversation turned to a discussion of various projects. (Id. at 185).

Later that day, King met with Deborah Dawson, MARTA's Assistant General Manager for Human Resources. (PSMF ¶ 64). She told Dawson that she was concerned about Connelly's work performance and his interaction with coworkers, and she described what had taken place during the earlier meeting. (Doc. 53, Dawson Dep. at 58-59). Dawson instructed King to provide "tangible evidence" supporting her concerns. (SMF ¶ 15). King later submitted a folder of documents to Dawson, but

---

actually occurred on June 15, 2009, (see SMF ¶ 11; PSMF ¶ 48).

[3]King denies that Connelly threatened to file a complaint with the DEO. (Doc. 54, King Dep. at 157-58). She does admit, however, that Connelly implied that he was going to take legal action. (Id. at 157, 233).

AO 72A
(Rev.8/82)

those documents are not included in the record.  (Doc. 53, Dawson Dep. at 63-65).

Dawson could not recall whether there was any evidence that King had discussed her

concerns with Connelly.  (Id. at 175).

A couple of weeks later, King drafted a memorandum addressed to Connelly that

was entitled "Follow-up on Our Conversation on Monday, June 15, 2009."

(Doc. 54-20, King Dep., Exh. 17).[4]  In it, King noted that she had received complaints

from MARTA employees and from third parties that Connelly was "rude,

condescending, arrogant, and non responsive."  King observed that Connelly's behavior

during the June 15 meeting was "quite similar" to what was described in those

complaints.  She  noted that Connelly had accused her of railroading him, had refused

to discuss the complaints without an attorney present, and "also stated that 'I better have

exact proof to back up what I was saying or you would seek your rights' which to me

meant legal action."  King described Connelly's behavior as "inappropriate,

disrespectful, and insubordinate" and noted that "[t]his is an unacceptable situation for

which we must seek a solution."  (Id.).  King showed this memorandum to Dawson, but

---

[4]The memorandum was dated June 29, 2009.

Connelly never received a copy of it.[5] (Doc. 54, King Dep. at 224; Connelly Decl. ¶¶ 4-7).

Several weeks later, King met with Dawson and MARTA's chief legal counsel, Elizabeth O'Neill, to discuss her issues with Connelly. (SMF ¶ 20). King ultimately decided to terminate Connelly's employment. (Id. ¶ 21). On August 28, 2009, King sent an email to Dawson noting that "Liz [O'Neill] is concerned that [Connelly] has already started building his case and thinks we need to act quickly." (Doc. 53-14, Dawson Dep., Exh. 44 at 2).

On September 21, 2009, King, Dawson, and a MARTA attorney, LaShanda Dawkins, met with Connelly and informed him that he was being terminated. (PSMF ¶ 125). Dawson had drafted a set of "speaking points" for King to use during the meeting. (Id. ¶ 126). The "speaking points" directed King to explain her decision as follows:

> Darryl, I asked for this meeting today to discuss the future of the Department. As you are aware, we are working in a rapidly changing environment, and the previous needs and focus of the Office of TOD are changing. Over the past several months, it has become extremely clear that we must proceed in a different direction. For this reason, effective immediately, your employment with MARTA is terminated.

---

[5]King testified that she did give a copy of the memorandum to Connelly, but Connelly denies receiving it. (See Doc. 54, King Dep. 224; Doc. 83-8, Connelly Decl. ¶¶ 4-7).

AO 72A
(Rev.8/82)

(Doc. 53-17, Dawson Dep. Exh. 47 at 2). It is unclear whether King actually used these "speaking points" during the meeting. (See Doc. 53, Dawson Dep. at 83-84).[6] Connelly testified that MARTA portrayed his termination as a layoff due to a lack of work, but he believed that the real reason for his termination was race discrimination. (Doc. 52, Connelly Dep. at 247-48).

MARTA reported Connelly's termination on a form provided to the Georgia Department of Labor. (PSMF ¶¶ 133-34; Doc. 54-23, King Dep., Exh. 20). MARTA described the reasons for Connelly's termination as follows: "The employee was discharged because his services were no longer needed. However, the employee was not charged with violating any company policies or procedures." (PSMF ¶ 134; Doc. 54-23, King Dep., Exh. 20). Another question on the form asks the employer to "[e]xplain the policy, order, rule or instruction" that the employee failed to follow. MARTA responded, "None." (Doc. 54-23, King Dep., Exh. 20 at 2).

In her deposition testimony, King asserted that the Department of Labor form was accurate because Connelly was terminated because of his attitude and approach towards his work, not due to a failure to follow rules and procedures. (Doc. 54, King Dep. at

---

[6]Dawson recalled that "the meeting was short. I believe that Ms. King advised Mr. Connelly that his employment was being terminated. And I cannot recall how much or little detail she may have gone into." (Doc. 53, Dawson Dep. at 83).

288). She explained that the phrase "his services were no longer needed" meant that Connelly "was not performing in that particular position in a way that was productive and conducive to getting the department work done . . . and we needed another person to accomplish our goal." (Id. at 286-87).

The evidence also includes an internal termination record that was signed by both King and Dawson. (Doc. 54-24, King Dep., Exh. 21). On that form, the reason for Connelly's termination is listed as "Involuntary Other." The boxes for "Unsatisfactory Performance," "Violation of Work Rules," and "Insubordination" are not checked. (Id.). King testified that she selected the "Involuntary Other" box at the direction of Human Resources. (Doc. 54, King Dep. at 280-81). She noted that MARTA prefers not to list negative information on its termination forms because it does not want to prevent its former employees from obtaining other work. (Id. at 280). King testified that the "Involuntary Other" box accurately described the reason for Connelly's termination, which was that "his services were no longer needed." (Id. at 285).

The position of Director of TOD remained vacant following Connelly's termination. (Doc. 54, King Dep. at 317-18). King testified that she did not want to fill the position until she had a better understanding of the skills and capabilities of her staff. (Id. at 317). In March 2011, MARTA created a new position, Director of

10

Development and Regional Coordination, that merged the functions of the Director of TOD with those of the Director of Regional Services. (Id., Exh. 24). Dr. John Crocker, who is Caucasian, was selected to fill the new position. (PSMF ¶ 153; Doc. 54, King Dep. at 23).

## III. Discussion

### A. Race Discrimination

Title VII makes it unlawful for an employer to discharge an employee based upon the employee's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). Section 1981 prohibits racial discrimination in the making and enforcing of contracts, including employment contracts. 42 U.S.C. § 1981. Claims under these two statutes are analyzed using the same legal framework. Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

To survive summary judgment in an employment discrimination action, the plaintiff must produce either direct evidence or circumstantial evidence showing that the employer discriminated against him based upon a protected ground. Dixon v. The Hallmark Cos., Inc., 627 F.3d 849, 854 (11th Cir. 2010). In this case, Connelly is relying upon circumstantial evidence.[7] He first argues that he has established an

---

[7]As Connelly correctly acknowledges, King's statements referring to herself as a "mean black bitch" do not constitute direct evidence of discrimination. "To be direct

AO 72A
(Rev.8/82)

inference of discrimination using the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In the alternative, he asserts that he has established a "convincing mosaic" of circumstantial evidence that would allow a jury to infer discrimination, like the plaintiff in Smith v. Lockheed-Martin Corp., 644 F.3d 1321 (11th Cir. 2011).

I first will address whether Connelly can survive summary judgment using the McDonnell Douglas framework. Under that approach, the plaintiff has the initial burden of presenting a prima facie case of discrimination. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004). The burden of production then shifts to the defendant to offer a legitimate, non-discriminatory reason for the challenged employment decision. Id. Once the defendant has offered such a reason, the burden of production shifts back to the plaintiff to prove that the proffered reason is a mere pretext for discrimination. Id.

The Eleventh Circuit has explained that "[t]he methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the

_____

evidence, the remark must indicate that the employment decision in question was motivated by race." Scott v. Suncoast Beverage Sales, Ltd., 295 F.3d 1223, 1227-28 (11th Cir. 2002). Here, King's remarks were not connected to the decision to terminate Connelly's employment. (See PSMF ¶¶ 32-36, 40, 42-45).

employment situation." Id. In the discriminatory termination context, the most commonly-used formulation requires the plaintiff to show that he: (1) was a member of a protected class; (2) was qualified for the job; (3) suffered an adverse employment action; and (4) was treated less favorably than a similarly-situated individual outside his protected class. See, e.g., Burke–Fowler v. Orange Cnty., Fla., 447 F.3d 1319, 1323 (11th Cir. 2006). Another line of cases holds that a plaintiff may establish a prima facie case by showing that he: (1) was a member of a protected class; (2) was qualified for the job; (3) was terminated despite his qualifications; and (4) after his termination, the position remained open and the employer continued to seek applicants. See, e.g., Evans v. McClain of Ga., Inc., 131 F.3d 957, 964 (11th Cir. 1997).

In this case, Connelly cannot make out a prima facie case under the traditional formulation because he has not identified any non-white employees who were treated more favorably than he was treated. See Burke–Fowler, 447 F.3d at 1323. In addition, Connelly cannot establish a prima facie case under Evans. The Director of TOD position remained open until March 2011, when it was eliminated and its functions were merged into another position. (See Doc. 54, King Dep. at 317-18 and Exh. 24). Connelly has not pointed to any evidence showing that Defendants actively tried to fill the position prior to its elimination. Thus, the fourth prong of the Evans formulation

is not satisfied.  See Evans, 131 F.3d at 964.  In short, Connelly has not met his burden of establishing a prima facie case under McDonnell Douglas.

The Eleventh Circuit has stated, however, that the McDonnell Douglas framework is only one way to make out a case of discrimination.  Smith, 644 F.3d at 1328.  Even if a plaintiff cannot establish the traditional prima facie case, the plaintiff can still survive summary judgment by "present[ing] circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent."  Id.  "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.' "  Id. (quoting Silverman v. Bd. of Educ. of City of Chicago, 637 F.3d 729, 734 (7th Cir. 2011).

The Smith decision gives some indication of what sort of evidence is sufficient to create a "convincing mosaic" of discrimination.  In that case, Plaintiff Mitten, who was white, was terminated for forwarding a racially insensitive "joke" email (the "NASCAR email") that contained offensive stereotypes about blacks.  Id. at 1324.  Other white employees who distributed the same email were also terminated.  Id. at 1336.  Mitten later learned, however, that  two black employees had forwarded similar racist "joke" emails but had not been terminated.  Id. at 1324.

14

Unlike Mitten, the black employees were not supervisors. Id. at 1326. Therefore, they could not serve as comparators for purposes of McDonnell Douglas. Id. at 1326-27. Nevertheless, the Eleventh Circuit concluded that Mitten had produced sufficient circumstantial evidence of race discrimination to defeat Lockheed's summary-judgment motion. First, some of the other Caucasian employees who were terminated for forwarding the NASCAR email were non-supervisors, just like the black employees who were not terminated. Id. at 1341-44. That suggested that the real reason for the disparate treatment was race, not Mitten's status as a supervisor.

In addition, the Eleventh Circuit noted that Lockheed had a motive for treating the white employees less favorably than the similarly-situated black employees. Lockheed had recently come under scrutiny due to a racially-motivated shooting rampage by a white supremacist employee at the company's Meridian, Mississippi plant. Id. at 1329. The company was accused in litigation and in the media of doing nothing to prevent the shooting despite knowing about the shooter's racist beliefs and violent threats. Id. at 1329-31, 1334-35. According to the Eleventh Circuit, a reasonable jury could conclude from those surrounding circumstances that Lockheed terminated Mitten and the other Caucasian employees to send a message that the company was "committed to curbing racism aimed at black employees." Id. at 1345.

15

The company did not, however, have the same motivation for disciplining black employees who had engaged in similar misconduct. Id.

There was also evidence that Lockheed's disciplinary review committee had explicitly considered race in determining whether to fire Mitten and the other Caucasian employees. A committee member had prepared a spreadsheet, referred to as the "matrix," that listed various identifying information about the employees who had sent the NASCAR email. Id. at 1336. One of the columns on the matrix indicated whether the employee was white or black. Id. The Eleventh Circuit observed that "Lockheed's injection of race into its decision-making process yields an unavoidable inference that the employee's race impacted the discipline determination, and it is a jury's province to decide whether race actually bore on the decision to terminate Mitten." Id. at 1346. Accordingly, the Eleventh Circuit reversed the district court's grant of summary judgment to Lockheed. Id. at 1346-47.

The evidence of racial discrimination in this case is considerably weaker than the evidence presented in Smith. Connelly relies primarily upon the three incidents where King described herself as a "mean black bitch." (See PSMF ¶¶ 32-36, 40, 42-45). He suggests that those remarks show a "preoccupation with race" and indicate that racial considerations played a role in King's decision-making. (See Doc. 83 at 12-13).

16

I do not believe, however, that a reasonable jury could draw such an inference from King's remarks. Those comments were not related to the decision to terminate Connelly or to any other tangible employment decision. (See PSMF ¶¶ 32-36, 40, 42-45). Also King was referring only to herself when she made these comments. She did not make any derogatory remarks about Connelly or any other person. The nature and context of King's remarks weigh against a finding that they were indicative of race discrimination. In addition, King made only three arguably racial comments during the ten-month period where she and Connelly worked together, which further cuts against Connelly's argument that race was a significant factor in King's decision-making. I conclude that King's remarks, standing alone, are insufficient to support a jury verdict in Connelly's favor on his discriminatory termination claim.

Connelly also notes that King would visit with black employees but not with him or her other white subordinates. (See Doc. 52, Connelly Dep. at 107-08), There is no evidence, however, that King favored blacks over Caucasians with respect to any term or condition of employment. The mere fact that a supervisor socializes more with employees of one race as opposed to another race is insufficient to show that the supervisor's decisions are motivated by discriminatory animus. Cf. Douglas v. J.C. Penney Co., Inc., 474 F.3d 10, 15 (1st Cir. 2007) (female supervisor's habit of eating

lunch with female employees rather than male plaintiff was insufficient to prove gender discrimination).

Connelly has fallen short of the evidentiary showing made by the plaintiff in Smith. In that case, the plaintiff was able to establish that: (1) black employees who had engaged in similar misconduct were not terminated; (2) the employer had a motive for treating black and white employees differently; and (3) there was evidence that the employer considered the plaintiff's race in deciding whether to terminate him. See Smith, 644 F.3d at 1341-46. Here, Connelly has only been able to point to three isolated comments and his own observation that King was more friendly towards black employees. I conclude that Connelly has failed to present a "convincing mosaic" of circumstantial evidence that would allow a jury to conclude that he was fired because of his race. See Smith, 644 F.3d at 1328.

In sum, Connelly has failed to establish a prima facie case of race discrimination under McDonnell Douglas. In addition, he has not offered sufficient circumstantial evidence from which a reasonable jury could make a finding of race discrimination. Accordingly, I recommend that Defendants' Joint Motion for Summary Judgment be granted with respect to Connelly's discriminatory termination claim.

18

## B. Retaliation

### 1. Prima Facie Case

Title VII and §1981 both prohibit an employer from retaliating against an employee who has opposed an unlawful racially motivated employment practice. 42 U.S.C. § 2000e-3(a); CBOCS West, Inc. v. Humphries, 553 U.S. 442, 445, 128 S.Ct. 1951, 1954, 170 L.Ed.2d 864 (2008). Under the McDonnell Douglas framework, a plaintiff must first establish a prima facie case of retaliation by showing that "(1) [he] engaged in statutorily protected activity; (2) [he] suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action." Chapter 7 Trustee v. Gate Gourmet, Inc., 683 F.3d 1249, 1258 (11th Cir. 2012) (quotations omitted). An employee engages in protected activity by expressing an intent to file a charge of discrimination, even if the employee never actually files such a charge. See E.E.O.C. v. L.B. Foster Co., 123 F.3d 746, 754 (3d Cir. 1997) (holding employee engaged in protected activity by telling her supervisor that she intended to file a charge of sex discrimination, even though she later changed her mind and announced that she was not going to file a charge).

In this case, Connelly testified that he told King during the June 15, 2009, meeting that he was going to file a complaint with MARTA's DEO. (See Doc. 52,

Connelly Dep. at 184-85). Defendants do not contend that such a statement would not constitute protected activity.[8] Instead, they argue that no reasonable jury could find Connelly's testimony to be credible. First, Defendants suggest that any reference to the DEO would have been "out of place" because Connelly did not make any accusations of race discrimination during the June 15 meeting. (Doc. 75-1 at 22). Next, Defendants point out that Connelly likely would not have been deterred from filing a charge if he had intended to do so because King had already vowed to write him up. (Doc. 89 at 15). Defendants also contend that, if Connelly had stated that he was going to the DEO, King would have mentioned that fact to Dawson and would have brought the matter to the DEO's attention. (Doc. 75-1at 23-24; Doc. 89 at 14-15).

All of those arguments could possibly convince a jury that Connelly's testimony was incredible or unworthy of belief. However, for purposes of this motion for summary judgment, I must make all credibility determinations in favor of Connelly and draw all factual inferences in his favor. Although a court should not accept testimony that "is blatantly contradicted by the record, so that no reasonable jury could believe it,"

---

[8]King testified that she would have taken such a statement to mean that Connelly intended to file a discrimination complaint. (See Doc. 54, King Dep. at 159).

AO 72A
(Rev.8/82)

Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007),[9] I do not believe that Connelly's testimony rises to that level of implausibility. The only evidence as to what happened at the meeting is the conflicting testimony of King, who asserts that Connelly never mentioned any charge of discrimination, and Connelly, who testified that he did make such a statement. (Compare Doc. 54, King Dep. at 157-58 with Doc. 52, Connelly Dep. at 184-85). It is the jury's role to decide between those conflicting accounts.

Defendants observe that Connelly's testimony is self-serving, (see Doc. 89 at 3, 16), but "[c]ourts routinely and properly deny summary judgment on the basis of a party's sworn testimony even though it is self-serving." Price v. Time, Inc., 416 F.3d 1327, 1345 (11th Cir. 2005). There are some cases holding that a party may not defeat summary judgment by relying upon self-serving statements. Those cases, however, involve situations where the plaintiff is making conclusory allegations that are not supported by personal knowledge. See, e.g., Stewart v. Booker T. Washington Ins., 232 F.3d 844, 851 (11th Cir. 2000) (holding that plaintiff's factual allegation did not have to be accepted as true for purposes of summary judgment because it was not based upon personal knowledge). When the plaintiff is describing events that he personally

---

[9]In Scott, a videotape plainly contradicted the plaintiff's description of a car chase. Scott, 550 U.S. at 379-80, 127 S.Ct. at 1775-76.

witnessed or conversations that he participated in, a court must accept that testimony as true for summary judgment purposes.

Accordingly, I find, for purposes of this summary judgment motion, that Connelly did express an intent to file a complaint with the DEO, and, therefore, he did engage in protected activity. Defendants do not dispute that Connelly suffered a materially adverse action, nor do they argue that he has failed to establish causation. Therefore, I conclude that Connelly has established a prima facie case of retaliation. See Gate Gourmet, Inc., 683 F.3d at 1258.

## 2. Pretext

Once a plaintiff has a prima facie case of retaliation, the burden of production shifts to the defendant to offer a legitimate reason for the challenged employment action. Crawford v. Carroll, 529 F.3d 961, 976 (11th Cir. 2008). If the defendant is able to do so, the burden shifts back to the plaintiff to show that the proffered reason is merely a pretext for unlawful retaliation. Id. A plaintiff may demonstrate pretext in one of two ways: "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).

AO 72A
(Rev.8/82)

The plaintiff may show that an employer's reason is unworthy of belief by identifying "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the proffered explanation. Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotation omitted). "Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc). The fact that an employer has shifted reasons may cast doubt on the credibility of the employer's explanation. See Dickson v. Amoco Performance Prods., Inc., 910 F.Supp. 629, 637 (N.D. Ga. 1994) (plaintiff was able to demonstrate pretext by showing that employer offered different reasons for his discharge at different times); see also Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1194 (11th Cir. 2004) (employer's shifting explanations as to whether plaintiff's actions violated a contract, a non-compete agreement, an unwritten policy, or a standard industry practice constituted evidence of pretext).

In this case, Defendants assert that Connelly was terminated for poor work conduct, poor interpersonal skills, and his unwillingness to cooperate with his superiors. There is some evidence that King did, in fact, have concerns about Connelly's performance in those areas. For example, two of Connelly's subordinates indicated that

23

he was inefficient and "delay[ed] the work of the office. (See Doc. 75-3, Exh. 1, Remillard Aff. ¶ 9; Doc. 75-4 , Exh. 2, Tarantino Aff. ¶ 10). In addition, King received complaints about Connelly's behavior from individuals inside and outside of MARTA. (See Doc. 54-20, King Dep., Exh. 17).

Nevertheless, Connelly has presented evidence from which a jury could conclude that those issues were not the real reasons for his termination. See Burdine, 450 U.S. at 256, 101 S.Ct. at 1095. First, at the time when the decision was made, Defendants did not indicate that Connelly was being let go due to problems with his performance or communication. The "speaking points" that King was supposed to use during the September 21 meeting indicate that Connelly was being terminated because the needs of his position were changing and MARTA needed to move in a different direction. (Doc. 53-17, Dawson Dep. Exh. 47 at 2). No mention was made of Connelly's work conduct, his interpersonal skills, or his interactions with King. (See id.).

Similarly, on a form completed for the Georgia Department of Labor, MARTA explained that Connelly was terminated only because "[h]is services were no longer needed." (See Doc. 54-23, King Dep., Exh. 20 at 2). MARTA noted that Connelly had not been charged with violating a work rule or policy. (See id.). Finally, an internal termination record indicates that Connelly was not terminated for "Unsatisfactory

Performance," "Violation of Work Rules," or "Insubordination," but rather, for an unspecified reason, "Involuntary Other." (Doc. 54-24, King Dep., Exh. 21).

Defendants have argued that neither the "speaking points" nor the termination records are inconsistent with their position that Connelly was terminated for poor work conduct. They cite King's testimony that MARTA chose not to put any negative information on the internal termination record because MARTA did not want to hinder Connelly's efforts to obtain employment elsewhere. (See Doc. 54, King Dep. at 280-81). Defendants also assert that the Department of Labor form was accurate because Connelly was not, in fact, terminated for violating a work rule—instead, he was terminated for his poor interpersonal skills and his inability to accept direction from his supervisor, King. Thus, Defendants assert that these documents are not facially inconsistent with the proffered legitimate, non-retaliatory reasons for Connelly's termination.

A reasonable jury could decide to credit Defendants' explanations and could find that the "speaking points" and the termination forms do not support a finding of pretext. On the other hand, a jury also could find that Defendants have offered shifting reasons for Connelly's termination—first trying to portray it as being due to a reorganization, and then asserting, in response to Connelly's charge of discrimination, that he was

25

terminated for cause.[10]  And if the jury were to conclude that MARTA has not given a consistent explanation for Connelly's termination, it could draw the inference that the real reason for his termination was retaliation.  See Dickson, 910 F.Supp. at 637; Cleveland, 369 F.3d at 1194.

The August 28, 2009, email from King to Dawson also could serve as evidence of pretext.  In it, King explained that MARTA's General Counsel, O'Neill, was "concerned that [Connelly] is already building his case and thinks that we need to act quickly."  (See Doc. 53-14, Dawson Dep., Exh. 44 at 2).  A reasonable jury could conclude from that email that the real reason why Defendants terminated Connelly was to prevent him from using his position within MARTA to gather evidence in support of his race discrimination claim.

Another piece of evidence that could support a finding of pretext is King's June 2012 memorandum.  (See Doc. 54-20, King Dep., Exh. 17). In that document, King described  Connelly's behavior during the June 15 meeting as disrespectful and inappropriate.  Among other things, she noted that Connelly had accused her of

_____

[10]Defendants note that Connelly himself did not view his termination as being due to a reorganization. (See Doc. 89 at 9-10).  However, what Connelly stated is that MARTA tried to portray his termination as a layoff but that the real reason for his termination was race discrimination.  (See Doc. 52, Connelly Dep. at 247-48).  There is no evidence that MARTA ever clearly stated that Connelly was being terminated for poor work conduct, poor interpersonal skills, or insubordination.

"railroading" him and had threatened to take legal action. (See id.). When the memorandum is viewed together with the August 28 email and the termination records, a reasonable jury might infer that King viewed Connelly's threat to file a DEO charge as a form of insubordination.

I conclude that the above evidence, when viewed in the light most favorable to Connelly, could support a jury finding that Defendants' proffered reasons for terminating him are a mere pretext for unlawful retaliation. Therefore, I recommend that Defendants' motion for summary judgment be denied with respect to Connelly's retaliation claim.

## IV. Conclusion

For the reasons stated above, I **RECOMMEND** that Defendants' Joint Motion for Summary Judgment (Doc. 75) be **GRANTED IN PART** and **DENIED IN PART**. I recommend that the Court grant summary judgment for Defendants on Connelly's discriminatory termination claim but deny summary judgment as to Connelly's retaliation claim.

IT IS SO RECOMMENDED this 7th day of December, 2012.

_Gerrilyn G. Brill_
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/82)