IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DARRYL P. CONNELLY,

    Plaintiff,

      v.

METROPOLITAN ATLANTA
RAPID TRANSIT AUTHORITY, et
al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:11-CV-2108-TWT

## OPINION AND ORDER

This is an employment discrimination action. It is before the Court on the Defendant MARTA's Motion for Judgment as a Matter of Law [Doc. 147]. Darryl Connelly, who is white, began working for MARTA in 2002. He was promoted to the position of Director of Transit Oriented Development & Real Estate in March 2006. Connelly's immediate supervisor was the Assistant General Manager of Planning. In November 2008, MARTA hired Cheryl King, who is black, to fill that position. In December 2008, King met with some of Connelly's subordinates. Two employees, John Remillard and Ted Tarantino, told her that Connelly was an inefficient manager and was delaying the work of the office. On two occasions, Connelly heard King make remarks that he believed were indicative of racial bias. At a January 2009

T:\ORDERS\11\Connelly\jml.wpd

planning meeting, an outside developer, Ray Argo, who was Caucasian, was giving a presentation on the time line for a certain project.  While Argo was speaking, King became "extremely upset."  She looked at Argo and at Connelly, and stated, "I'll bet you think I'm a mean black bitch."  He testified at trial that: "And so it was that instance that I thought there might be a problem related to race."  The second incident where King made reference to race occurred during a meeting in May 2009.  King became upset with the progress of a project by a developer and instructed Connelly: "Tell them I'm a mean black bitch."  Aside from those incidents, Connelly also observed that King would visit with black employees, but not with him or with Ted Tarantino, who also was white.[1]

On June 15, 2009, King called Connelly into her office and told him that she had received complaints that he was not returning telephone calls and was behaving arrogantly. Connelly asked for more details about the complaints, but King declined to provide any further information. Connelly accused King of "railroading" him and stated that he was going to get an attorney involved and file a complaint with MARTA's Office of Diversity and Equal Opportunity which is responsible for investigating claims of discrimination. King then said that she was going to "write up"

---

[1]This summary of the trial testimony is based upon the Plaintiff's testimony at trial.  Significantly, Ms. King did not deny making the "mean black bitch" comments.

Connelly. Connelly understood that as a response to his statement that he was going to file a DEO complaint.  At that point, the conversation turned to a discussion of various projects. Connelly never did file a DEO complaint.  Several weeks later, King met with Deborah Dawson and MARTA's chief legal counsel, Elizabeth O'Neill, to discuss her issues with Connelly.  King ultimately decided to terminate Connelly's employment.  On August 28, 2009, King sent an email to Dawson noting that "Liz [O'Neill] is concerned that [Connelly] has already started building his case and thinks we need to act quickly."  On September 21, 2009, King, Dawson, and a MARTA attorney, LaShanda Dawkins, met with Connelly and informed him that he was being terminated.  This was five days before he was to be married.  Connelly was unemployed for about two years.  He lost his house, and he and his wife were unable to consummate a planned adoption of a child.

In June 2011, Connelly filed a four-count complaint against MARTA and King raising claims under Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Count One of the complaint asserted that MARTA terminated Connelly on account of his race, in violation of Title VII.  Count Two asserted that MARTA unlawfully retaliated against Connelly after he engaged in activity protected by Title VII. Count Three alleged that both Defendants violated § 1981 by terminating Connelly due to his race. Finally, Count Four raised a claim of retaliation against both defendants

under § 1981.  After discovery, the Defendants moved for summary judgment.  The Magistrate Judge recommended granting the motion for summary judgment on the race discrimination claims, but denying it on the retaliation claims because of the "mean black bitch" comments and the temporal proximity between his complaint of discrimination and his termination.  I accepted the Report and Recommendation and granted in part and denied in part the motion for summary judgment.  The case was then set for trial.

On May 17, 2013, a jury returned a verdict in favor of the Plaintiff on his Title VII claim of retaliation against MARTA. Specifically, the jury found that MARTA retaliated against the Plaintiff and awarded him $500,000 for lost wages and emotional pain and mental anguish.  The jury found in favor of the Defendant King on the Plaintiff's § 1981 retaliation claim against her.  MARTA claims that the verdict should not stand because: (1) the verdict against MARTA is inconsistent with the verdict in favor of Defendant King who was the admitted final decision-maker with respect to the termination of the Plaintiff; and (2) the damage award exceeds the statutory maximum allowable under Title VII of the Civil Rights Act.

The Plaintiff denies that the verdicts are inconsistent.   He argues that under Title VII, MARTA is liable if Connelly's termination was proximately caused by any MARTA agent acting with retaliatory motive.  According to the Plaintiff, the jury

heard ample evidence of retaliatory motive by two other MARTA officials, Deborah Dawson (MARTA's Assistant General Manager for Human Resources) and Elizabeth O'Neill (MARTA's Chief Legal Counsel). He argues that the jury also heard ample evidence that retaliatory animus of either or both of these agents proximately caused the termination.  He argues that Dawson and O'Neill were active participants in the decision-making process; there was extensive evidence from which the jury could reasonably conclude that Dawson, O'Neill, or both were the actual catalysts of the decision to terminate Connelly.

The Plaintiff must lose this argument for two reasons.  The first is that the argument is totally inconsistent with the Plaintiff's theory of the case from beginning to end.  The Plaintiff has always taken the position that the Defendant King was the final and only decision-maker with respect to Connelly's termination.  As stated by the Plaintiff in the Consolidated Pretrial Order approved by the Court in this case, "there is no set of facts under which one Defendant, but not the other, could have retaliated against Connelly." (Consolidated Pretrial Order at p. 21) (emphasis added). The evidence presented during the trial was that Cheryl King, who was the Assistant General Manager for Planning at MARTA and the Plaintiff's supervisor, made the decision to terminate the Plaintiff and that her decision was final and not reviewable. In closing argument, counsel for the Plaintiff stated: "Ladies and Gentlemen, the

decision to fire Darryl Connelly was made by the person who made that decision, Cheryl King; and it was made the moment he threatened to file a DEO complaint." In closing, he said: "In that verdict form, we will ask you to find both Ms. King and MARTA committed retaliation. There are two separate blanks for them. And we think it's very clear that Ms. King made a decision for a retaliatory purpose, and she acted on behalf of MARTA, and both Defendants committed retaliation."

It was undisputed at trial that Ms. King had the authority to fire and in fact did fire Mr. Connelly. There was no evidence – and no claim – that Dawson or O'Neill had the authority to fire him. And there was no evidence that their participation in the process of firing the Plaintiff was motivated by retaliation. No complaint of discrimination had been made against them. The Plaintiff never argued to the jury that they could find against MARTA because of Dawson and O'Neill's participation in the process of implementing the decision made by Ms. King. MARTA was never put on notice that it had to defend itself against what is known as a "cat's paw" theory of liability. Everybody understood that MARTA's liability was based upon respondeat superior liability for the conduct of Cheryl King.

The second reason why the Plaintiff must lose the argument is that the law is against him. In the case of <u>Lincoln v. Board of Regents of University System of Georgia</u>, 697 F.2d 928 (11th Cir. 1983), the jury also found in favor of the individual

defendants but rendered an advisory verdict against the Board of Regents in favor of the plaintiff on her discrimination claim.  The Board of Regents made the same claim that MARTA is making here.   The Court of Appeals responded by saying: "Undoubtedly, a verdict exonerating an agent while holding his principal liable for his actions would be an inconsistent resolution of factual questions."  Id. at 934. Later in the opinion, the court stated more specifically: "We have no doubt that a judgment holding a principal liable in a Title VII case of this type would be inconsistent with a verdict exonerating under § 1981 the employees from whose actions Title VII liability derives."  Id. at 935. That is precisely the situation that we have here.  The verdicts are inconsistent and unreconcilable.

So what do I do about it?  Again, case law provides the answer.  In de Feliciano v. de Jesus, 873 F.2d 447 (1st Cir. 1989) (Breyer,  J.), the Court of Appeals for the First  Circuit reversed a judgment against the corporate defendant when the jury had returned a verdict in favor of the individual defendant decision-maker.  The court held:

> In this case, the only person plaintiffs claimed to have [final decision making] authority was de Jesus. The record contains no evidence that any other FCC officials-such as the Personnel Director or the Committee appointed to report to de Jesus on the personnel files-had final policymaking authority.... Thus, the only legally adequate basis for the FCC's liability was eliminated by the jury's verdict in favor of de Jesus.

Id. at 450.  The court then addressed the question of what to do about the inconsistent verdicts:

> [W]e have examined how other appellate courts have dealt with roughly analogous "inconsistency" problems, such as where a jury returns verdicts in favor of an employee defendant, but against an employer whose liability was derivative of the employee's liability, and where, for some reason, the trial court does not resubmit the case to the jury. Most of the decisions favor granting judgment notwithstanding the verdict to the employer defendant.

Id. at 452.

In this case, the Plaintiff had a full and fair opportunity to convince a jury that Cheryl King retaliated against him.  He was unsuccessful.  I denied the Defendants' motion for directed verdict at the end of the Plaintiff's case although it was questionable whether he had an objectively reasonable belief that he had a claim of discrimination under federal law.  At the time of the June 15 meeting, there had not been any adverse action affecting the Plaintiff's employment.  None of the "harsh" e-mails had any racial overtones.  The Plaintiff's belief that the "mean black bitch" comments injected race into the workplace is very questionable.  The comments were made by Ms. King about herself, and may well have been true.  She never made any racially derogatory comments about any of her employees.  The Plaintiff was an extremely appealing and sympathetic person.  But that does not mean that he is entitled to compensation under federal civil rights laws because he was treated

unfairly.  Under all of the circumstances, the Defendant MARTA's motion should be granted.  The Defendant MARTA's Motion for Judgment as a Matter of Law [Doc. 147] is GRANTED.   The judgment is vacated and the Clerk is directed to enter judgment against the Plaintiff and in favor of both of the Defendants.

SO ORDERED, this 19 day of August, 2013.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge